THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* NEWTON C. BLEVINS, Plaintiff in Error.

*Opinion filed October 25, 1911.*

1. CRIMINAL LAW—*when it will be presumed that the jury were sworn.*    The return of the indictment and the presence of the accused at the trial and when judgment was pronounced upon the verdict against him must affirmatively appear from the record, but where the court has jurisdiction, the defendant is present and announces himself ready for trial and a jury is empaneled and the cause tried without objection, it will be presumed, unless the contrary is shown, that the jury were sworn.

2. SAME—*fact that record is silent affords no presumption that jury were not sworn.*    The fact that the record is silent on the subject affords no presumption, in the absence of any other showing, that the jury were not sworn.

3. SAME—*duty of court in appointing counsel for a defendant.* In appointing counsel for a defendant who is unable to employ counsel, it is the duty of the court to appoint counsel having sufficient ability and experience to fairly represent the defendant, present his defense and protect him from oppression.

4. SAME—*court must exercise discretion in permitting counsel paid by private persons to assist prosecution.*    The court may, in a proper case, permit counsel paid by private persons to assist the State's attorney in the prosecution of a criminal case, but the court, particularly where counsel appointed by the court are defending the accused, should not permit counsel for the accused to be overwhelmed, on account of their inexperience, by the ability and numbers of the counsel assisting the prosecution.

5. SAME—*parol proof that the defendant has been convicted of other crimes is incompetent.* It is not competent to prove by the accused, on cross-examination, that he had been convicted of crime and been in the penitentiary of another State, nor to show by the clerk of a circuit court, by parol, that the accused had pleaded guilty to a crime in the court of which the witness was clerk.

6. SAME—*when rule that testimony admitted without objection need not be excluded does not apply.* The rule that a party who permits evidence to be introduced without objection cannot thereafter move to exclude it because it is unfavorable does not apply against the defendant in a criminal case, where it appears that the counsel appointed by the court to defend him were inexperienced, and did not realize, at the time the evidence was admitted, that it was incompetent, though they discovered that fact before the trial was ended and moved to exclude the evidence.

7. SAME—*when court should, of its own motion, refuse to admit evidence.* Where the court, in spite of the protest of counsel appointed by the court to defend one accused of murder that they were inexperienced and overmatched by the array of counsel for the prosecution, refuses to limit the number of counsel assisting the State's attorney or to assign additional experienced counsel for the defense, it is its duty, of its own motion, when incompetent evidence of a highly prejudicial character is not objected to by defendant's counsel, to refuse to admit such evidence.

8. SAME—*when the judgment will be reversed though guilt is clear.* Where the jury in a murder trial fix the death penalty by their verdict, error in admitting incompetent evidence of a highly prejudicial character, and in permitting the trial to be conducted by an array of counsel for the prosecution which overwhelmed the inexperienced counsel appointed for the accused by the court, will require a reversal of the judgment although the evidence of guilt may be clear. (*People* v. *Cleminson, 250* Ill. 135, distinguished.)

9. SAME—*instruction should not assume fact which jury are to determine.* In a murder trial, where the defense denies the sufficiency of the evidence to identify the body found as that of the person alleged to have been murdered and does not concede that such person is dead or that he was killed, those questions are to be determined by the jury, and it is error to assume in the instructions that such person is dead and that he was killed.

10. SAME—*an instruction should explain the term "successfully impeached."* An instruction informing the jury of their right to disregard the uncorroborated testimony of witnesses who have been "successfully impeached" is improper, where no explanation of the meaning of that term is given.

WRIT OF ERROR to the Circuit Court of Johnson county; the Hon. WILLIAM N. BUTLER, Judge, presiding.

CHARLES J. HUFFMAN, and O. R. MORGAN, for plaintiff in error.

W. H. STEAD, Attorney General, THOMAS H. SHERIDAN, State's Attorney, and JOEL C. FITCH, (NOLEMAN & SMITH, and D. T. HARTWELL, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Plaintiff in error, Newton C. Blevins, was indicted at the August term, 1910, of the circuit court of Johnson county for the murder of James DePalma, an Italian, employed by the Carter Construction Company as foreman of a construction gang which had been engaged in constructing a railroad near Marion, Illinois. Plaintiff in error was a coal miner living at Scottsboro, Williamson county. On June 7, 1910, he and Luke Newton, with four others, went to a place known as "Mason's Tank," in Johnson county, on a fishing expedition. They had with them a tent and fishing outfit. Mason's tank is one of the tanks on the Big Four railroad from which locomotives are supplied with water and is located just north of Cache creek. The railroad at this place runs in a south-westerly direction. North of the tank is a small lake covering about two acres. Connecting with it from the north is Cypress creek, a stream or slough about forty or fifty feet wide and a quarter of a mile in length. On the west side of this slough the land is high and on the east side it is low and marshy and covered with dense brush and weeds. At the south end of the lake there is a concrete dam about thirty feet wide, near which the party of which plaintiff in error was a member pitched their tent. John Malee and James Bean, miners from Saline county, were also on a camping and fishing trip and their tent was located near by. The mines at that time were

closed on account of a strike and had been since April 1. On the morning of June 10 all the party except plaintiff in error and Newton returned to Marion. Before leaving they were instructed to buy some provisions for plaintiff in error and Newton at Marion and send the same by express to Karnak, a station about a mile south of Mason's tank. Plaintiff in error told them he had no money with which to pay the express on the provisions to be sent, and one of them gave him a quarter for that purpose. Plaintiff in error went to the water tank with those who were leaving, and after they boarded the train he started to return to the camp. While walking along the track he met James DePalma, with whom he was acquainted, who stated to him that he was going to visit his brother, who was working six miles below Karnak. At plaintiff in error's invitation he went over to the camp. He was introduced to Newton and the three of them took several drinks of whisky. During the conversation which followed, DePalma showed them $100 in money and a certificate of deposit on a bank in Metropolis, Illinois, for $300. DePalma stayed but a short time and then went away, returning again about noontime. According to the testimony for the People, DePalma was last seen eating dinner with plaintiff in error while Newton was sleeping off a drunk in the tent. For some reason plaintiff in error and Newton abandoned their previous intention of remaining at the camp and on the afternoon of June 10 returned home. DePalma was never seen alive afterwards. The conduct of plaintiff in error, and the exhibition by him of considerable sums of money and the cashing by him of the certificate of deposit issued to DePalma, caused suspicion to be directed against him and a search to be made for the body in the neighborhood of the tent occupied by him and his friends while fishing. On July 2 a body so badly decomposed as to be unrecognizable from its features was found in the brush on the east side of the slough. There were one or two bullet holes

through one side of the skull, and lead was lodged in and taken from the opposite side. Physicians testified that these wounds were sufficient to cause immediate death. Relatives and acquaintances of DePalma testified that they recognized the skeleton as his from dental work done on the teeth and a chip being broken off of one, also from a hat found with the skeleton and the shoes on its feet. The facts and circumstances proven by the prosecution tending to show that plaintiff in error murdered DePalma and robbed him were very strong. He attempted to explain his possession of money immediately after June 10 and how he happened to cash the certificate of deposit. He testified that he had over $100 saved up at that time, and that after he and Newton returned home Newton exhibited the certificate of deposit and asked him to cash it; that Newton gave him to understand he won the certificate in some game with DePalma, and promised he would give him part of the money if he would get the certificate cashed. He testified he took the certificate to the bank, received the cash for it, took it to Newton and Newton gave him three $20 bills. The testimony of plaintiff in error was contradicted by that of Newton and some other witnesses. Newton testified he could neither read nor write. The certificate, when presented at the bank, was endorsed with the names of DePalma and plaintiff in error. The cashier of the bank that issued the certificate of deposit testified he could not say the signature of DePalma on the back of it was in DePalma's handwriting, but in his opinion it was. Mike DePalma, a brother of James DePalma, and T. H. Walker, the contractor for whom James DePalma was foreman, testified the signature on the back of the certificate of deposit was not in the handwriting of James DePalma. The certificate was cashed at the Marion State and Savings Bank in Marion, and the cashier of that bank testified he asked plaintiff in error, before cashing it, if the signature was DePalma's and why DePalma gave the certificate to him; that plaintiff

251 — 25

in error said the signature was DePalma's and that he had traded him some property for the certificate. Plaintiff in error testified Newton told him to make that explanation if the bank made any inquiry as to how he came in possession of the certificate. Newton denied this. Plaintiff in error had considerable money on his way home on June 10 with Newton. Newton testified he showed him his pocketbook with a "wad" of money stuffed into it, but the witness had no knowledge of the amount. The conductor of the train they boarded to go home testified plaintiff in error exhibited to him a $20 bill.

The foregoing is the substance of a part, only, of the testimony, but as the judgment must be reversed for the reasons hereafter stated, we do not deem it necessary or important to further detail the evidence or its substance.

Error was assigned that the record as certified by the clerk did not show (1) the date of the return of the indictment; (2) that it did not show of whom the jury empaneled to try the case was composed or that they were sworn; and (3) did not show plaintiff in error was present in court throughout the trial and when the verdict of the jury was returned. Other objections to the sufficiency of the record we do not regard of sufficient importance to require specific mention.

At the February term of this court a diminution of the record was suggested by the Attorney General, and on his motion a writ of *certiorari* was issued to the clerk of the circuit court of Johnson county commanding him to send up a true and complete transcript. Notice was thereupon given plaintiff in error and his counsel by the People that at the March term, 1911, of the Johnson county circuit court the People would move the court to re-docket the cause and amend the record certified by the clerk so as to make it speak the truth. Such proceedings were had at said March term that the court found that in the record as written up by the clerk there were many errors, mistakes

and misprisions made by him and the record was amended. As amended the objections made to it as originally certified are obviated. Counsel for plaintiff in error contend that the court erred in amending the record, for the reason, it is claimed, there was no note, memorandum or memorial paper in the files of the case or upon the records of the court from which the amendment was authorized. There is no basis for this claim, unless it be with reference to the amendment showing that the jury were sworn. We do not find that any note, memorandum or memorial paper was offered in aid of this amendment. The record does sufficiently show a jury was empaneled, the names of the men composing it, that the case was tried before said jury, beginning August 17, and the verdict was returned August 20. The record does not show, and it is not asserted by counsel, that the jury were not, in fact, sworn to try the case, but it is not affirmatively shown by the record that the jury were sworn. No such question was raised when the jury was empaneled nor at any time during the trial, nor was this question raised by the motion for a new trial, which was in writing and specifically assigned the grounds upon which a new trial was asked. Even if the amendment of the record in this respect was unauthorized,—and as to this question the record must stand as originally written up by the clerk,—this assignment of error cannot be sustained. Some things must affirmatively appear from the record, such as the return of the indictment, the presence of the accused at the trial and when judgment is pronounced upon the verdict against him, but where, as here, the court had jurisdiction, the defendant was present and announced himself ready for trial, and thereupon a jury was called, empaneled and the cause tried without objection, it will be presumed the jury were sworn, unless the contrary is shown. The burden is upon the party alleging the error to sustain it. Because the record is silent as to whether the jury were sworn affords no presumption, in the absence of any other

showing, that they were not sworn.   In *Morton* v. *People*, 47 Ill. 468, it was assigned for error that it did not appear from the record a sworn officer attended the jury in their retirement.   The court held that in the absence of a showing to the contrary it would be presumed a sworn officer did attend the jury; that it was the duty of the court to require this to be done, and in the absence of evidence to the contrary it would be presumed the court performed its duty in this regard.

Plaintiff in error had no means to employ counsel, and when the indictment was returned against him the court appointed two lawyers from the Johnson county bar to defend him.   The indictment was returned into court on the 15th day of August, 1910, and on the same day plaintiff in error was arraigned, counsel appointed for him and the case set for trial August 17, at which time the trial was entered upon.   The State's attorney of Johnson county, the State's attorney of Williamson county, George White, of Williamson county, and George W. English, of Johnson county, all appeared for the prosecution.   On the 18th day of August, and after but three jurors had been accepted, one of the counsel appointed to defend plaintiff in error presented his motion and affidavit asking that the State's attorney of Williamson county, White and English be not permitted to appear and assist the prosecution.   The affidavit stated that plaintiff in error's counsel had not had sufficient time to acquaint themselves with his defense and prepare the case for trial; that they had had but limited experience in the trial of such cases; that one of them had been engaged in the practice of law less than two years; that the other one had given most of his attention to the practice in civil cases and had a limited experience in the practice in criminal law; that said counsel were greatly overmatched in experience and numbers by counsel appearing for the People, three of whom had no connection with the office of State's attorney of Johnson county but were employed and paid by outside

parties for their services; that by reason of the superiority of counsel appearing for the State in ability, experience and number, plaintiff in error was being oppressed and was in danger of losing his life or liberty on account of such oppression. The court denied the motion and refused to limit the number of counsel for the People and permitted the four lawyers named to prosecute the case to its conclusion. This ruling of the court is assigned for error. An examination of this record convinces us that this ruling of the court was erroneous. In *Hayner* v. *People*, 213 Ill. 142, it was held to be not beyond the power of 'the court to permit counsel paid by private parties to assist the State's attorney where there is no oppression of the defendant or injustice to him. The court said (p. 147) : "In granting such permission the court should see that the criminal law is not being used to gratify malice or personal ends, but cases frequently arise where the administration of public justice requires that the State's attorney should have assistance. There are cases where the State's attorney is clearly outclassed and overmatched by counsel for the defendant. Such matters must be left largely to the discretion of the court, whose duty it is to prevent oppression of the defendant and to permit such assistance as fairness and justice may require. It might be a wrong and oppression to a defendant to permit able and experienced counsel employed by private parties to assist a competent State's attorney in a contest with inexperienced or inefficient counsel for the defense." It does not appear from that case that the defendant was unable to employ his own counsel or that he was defended by counsel appointed by the court. If the law as stated in the case referred to applies where the defendant is able to and does employ his own counsel, it would seem that it would apply with greater force where he is unable to employ counsel and they are appointed by the court. When a court is called upon to appoint counsel for a defendant in a criminal case who is unable to employ

counsel for himself, it is the duty of the court to see that counsel is assigned having sufficient ability and experience to fairly represent the defendant, present his defense and protect him from undue oppression. Oppression may result to a defendant defended by young and inexperienced counsel where he is prosecuted by an array of experienced and able attorneys, either in arriving at a conclusion as to his guilt or innocence of the charge or in determining upon the punishment to be inflicted upon him where he is found guilty. There can be no doubt of the right of a court to permit counsel employed by private parties to assist the State's attorney, but this discretionary power should never be abused by permitting counsel for the defendant to be overwhelmed, on account of their inexperience, by the number and ability of counsel assisting the State's attorney; and this discretion should be exercised with greater caution where the counsel are appointed by the court than where they are his own voluntary selection. Consciousness of counsel, in this case, of their inferiority in knowledge and experience to counsel representing the prosecution could hardly fail to intimidate and embarrass them in their efforts to represent their client. This record shows that by reason of the inexperience of plaintiff in error's counsel incompetent evidence of a highly prejudicial nature was introduced by the prosecution on the trial. No reason appears in this case why so large an array of counsel for the prosecution, composed of experienced lawyers, should be thought necessary to a fair and impartial trial. In our opinion the court should have limited the number of lawyers assisting the State's attorney to one, or should have appointed additional experienced counsel to represent plaintiff in error.

On cross-examination the plaintiff in error was asked if he had ever been in the penitentiary in Kentucky, and answered he had. He was asked what for, and answered for shooting a fellow. He was also asked if, on an occasion and at a place named, a short time after June 10, he ex-

hibited some money and wanted to pay the State's attorney a fine. He answered he did,—that he had $40. He was then asked if a fine of $80 was not assessed against him for the larceny of a lady's suit-case at the depot, and if he paid it, to all of which he answered yes. Albert Blevins, brother of plaintiff in error, testified he lived near plaintiff in error and had borrowed money of him between March 23 and June 10, and between those dates he had seen plaintiff in error with money at different times. On cross-examination he was asked if he did not know plaintiff in error had, since the last day of March, been in jail charged with stealing a lady's suit-case and had not been able to work and that he could not raise the money or give bond to get out of jail,—all of which questions were answered in the affirmative. L. O. Caplinger, deputy circuit clerk of Williamson county, testified for the People that he was present when plaintiff in error pleaded guilty to larceny in Williamson county; that it occurred June 21, 1910, and a fine of $80 was imposed and was paid by plaintiff in error. Emery Morgan, son-in-law of plaintiff in error, testified in his behalf, and his testimony, if believed, would tend to throw suspicion against Newton. On cross-examination he was asked if a short time after his father-in-law's arrest he and Al Blevins, a brother of plaintiff in error, did not go out near the home of Newton and raise trouble and try to intimidate him. He answered he was not the cause of the disturbance and was not arrested. He had not been asked if he had been arrested, but after he said he did not cause the disturbance and was not arrested he was asked if he knew who was arrested for it, and said he was not arrested,—that the deputy sheriff told him to come in Monday and give bond. No objection was made to any of this testimony at the time it was offered, but after the evidence had been concluded counsel for plaintiff in error moved the court to exclude it on the ground that it was incompetent,

assigning the reasons for claiming it was incompetent. The motion was denied and an exception preserved.

There may be some basis for claiming the testimony of Albert Blevins and Emery Morgan was competent in view of the connection in which it was given, but it is not and could not be claimed it was competent to prove by plaintiff in error, on his cross-examination, that he had been convicted of a crime and served in the penitentiary in Kentucky, or to prove by the clerk of the circuit court, by parol, that he pleaded guilty to a crime in the circuit court of Williamson county. (*Bartholomew* v. *People,* 104 Ill. 601; *McKevitt* v. *People,* 208 id. 460.) Counsel for defendant in error argue that this testimony was admitted without objection; that counsel for plaintiff in error could not be permitted to thus allow all the incompetent questions to be answered and because the answers were prejudicial afterwards move to exclude the evidence. We do not regard this as a case to which that rule is applicable. It is very evident that the failure of counsel for plaintiff in error to object to the testimony was not because they hoped for favorable answers to questions asked. It is apparent the reason they did not object when the testimony was offered was that they did not know it was incompetent. They were inexperienced in criminal law, one of them having been admitted to the bar less than two years. Such experience as they may have had in the practice of their profession was not in the line of this case. Before the trial was over they appear to have discovered that the evidence was incompetent and they then moved to exclude it. The case is not to be treated as a case where the party is able to employ counsel and selects his own lawyer. Counsel for plaintiff in error were not of his selection. He had no means to employ anyone, and the court, as was its duty, appointed counsel to defend him. Assuming, as defendant in error contends, that the court knew something of the abilities and experience of counsel appointed, it follows

he must have known that they were not well equipped, by experience and practice, for the burden placed upon them. They protested at the outset that they were inexperienced and were overmatched by the array of able and experienced counsel for the State. The court refused to grant their appeal for relief from this situation, and having done so, and counsel for plaintiff in error being compelled to go on with the trial, the court owed it to plaintiff in error to see to it that no advantage came to the State by reason of the inexperience of counsel selected by the court for him. When incompetent evidence so prejudicial in character as that above referred to was sought to be introduced by the prosecution, the court should on his own motion have interfered and refused to allow it. Not having done so, the motion to exclude it should have been allowed when it was made.

Counsel for the State insist that even if the court did err in the respects pointed out, the evidence so conclusively shows the guilt of the plaintiff in error that the judgment should not be reversed. It is true, error will not always reverse in criminal cases where the guilt of the accused is conclusively shown, (*People* v. *Cleminson,* 250 Ill. 135,) but to this rule there are some exceptions. In murder cases the jury fixes the punishment to be inflicted, and the legislature has seen fit to allow a wide range in determining what the punishment shall be, the minimum being fourteen years in the penitentiary and the maximum death. In this case the death penalty was fixed by the jury, and it may well be that the weak manner in which plaintiff in error was defended, the vigorous manner in which he was prosecuted by four able and experienced lawyers, and the admission in evidence, on the trial, of incompetent testimony calculated to prejudice and degrade plaintiff in error in the minds of the jury, influenced the jury in determining the punishment that should be inflicted.

In *Farris* v. *People,* 129 Ill. 521, the defendant was convicted of murder and sentenced to be hanged. Proof of

defendant's guilt was conclusive. On the trial the prosecution was permitted to prove that after the murder the defendant ravished the wife of deceased, who had formerly been the wife of defendant but had been divorced from him and had married deceased. It clearly appeared that the assault upon the wife was no part of the motive of the murder and the evidence was held to be entirely incompetent. It was insisted in that case by the State that the proof of the defendant's guilt was so overwhelming (the killing under circumstances showing no provocation whatever having been proved by an eye-witness) that the admission of the testimony as to the assault upon the wife of the deceased was harmless error. The court said (p. 533) : "If the only punishment for the crime of murder in this State was death the point would be entitled to weight. If it was within the province of the court to assume that the jury would have inflicted the death penalty because the proof of guilt justified it, or if our decision was to affect this case alone, we might hesitate to order a reversal on this theory. The legislature has seen fit to clothe juries with a wide discretion in fixing the punishment to be inflicted upon one convicted of murder. Every defendant on trial for that crime is entitled to the full benefit of the statute. When all else has failed him he has a right to stand before a jury unprejudiced by incompetent, irrelevant evidence and appeal to them to spare his life. It is impossible for us to know what the jury in this case would have done but for the introduction of this incompetent evidence, much less is it our province to say what they should have done, and no opinion is expressed on that subject. We can only judge of the influence of such testimony upon the minds of the jury by experience and observation common to us all."

Whatever view we might entertain of our duty in this case if the punishment had been fixed at less than the maximum, to say that, notwithstanding important rights plaintiff in error was entitled to under the law were not accorded

him on the trial and his punishment fixed at death, we think he was not prejudiced, and that the verdict of the jury must have been the same and the punishment fixed at death even if he had been accorded the rights he was entitled to, would be to establish a dangerous precedent and one not justified by the law or the natural instincts of humanity.

It is contended that the court erred in giving instructions offered by the People and in refusing instructions offered by plaintiff in error. Instruction No. 3 given for the People is as follows:

"You are instructed that the term, 'in the peace of the People,' as used in the statute defining murder and in the indictment in this case and in these instructions, means, in effect, that the deceased, James DePalma, at the time he was killed, and immediately prior thereto, had not done anything to forfeit his right to live."

It is contended that this instruction assumes that James DePalma was dead and that he was killed. Plaintiff in error denied the sufficiency of the evidence to identify the body found as the body of James DePalma and never conceded that he had been killed or that he was dead. Whether or not DePalma was dead and had been killed were questions for the jury to determine, and it was error to give an instruction which assumed those facts to be true. The same objection is made to instructions Nos. 7, 9, 17, 23, 24 and 26. These instructions speak of DePalma as "the deceased," or "the deceased, James DePalma." For the reasons above mentioned these instructions should have been modified or refused.

Instruction No. 22 given for the People states the weight to be given to the testimony of a witness who has been "successfully impeached," and tells the jury that if they believe, from the evidence, that the testimony of any witness is untrue or unreliable and the witness has been "successfully impeached" on some material matter and has not been corroborated by other credible evidence, they may

disregard the testimony of such witness. No explanation was given of the meaning of the term "successfully impeached." Instructions similar to this were condemned in *Chicago City Railway Co.* v. *Ryan,* 225 Ill. 287, and *Metzger* v. *Manlove,* 241 id. 113. It was there said that in the absence of an explanation of the meaning of the term "successfully impeached" the jury might consider witnesses who were contradicted as having been impeached, "even though they might not believe that such contradicted witnesses had willfully testified falsely as to any material matter or even though the contradiction may have been as to an immaterial matter." This instruction should have been refused.

We find no other substantial error in the rulings of the court in giving and refusing instructions.

For the errors indicated, the judgment of the circuit court is reversed and the cause remanded.

*Reversed and remanded.*